63755. PIEDMONT ENGINEERING & CONSTRUCTION CORPORATION v. AMPS ELECTRIC COMPANY, INC.

BIRDSONG, Judge.

Breach of Contract. The facts of this case show that Piedmont Engineering & Construction Company was the prime contractor on several large apartment and condominium projects. One of these was in Gainesville (the Woodlake project) and one in Marietta (the Woods project). Piedmont subcontracted with Amps Electric Company, Inc. to perform all the electrical work on these projects. The agreement was that Amps would purchase all the electrical supplies necessary to complete the projects and install the electrical components of the projects. Amps bid a set rate for each project and was responsible for completing the electrical work within the bid cost subject to approved changes. The Woodlake project was bid at $72,375 and the Woods project bid at $116,911. Amps was located in Griffin and found that servicing the work at the Woodlake site in Gainesville was creating a transportation problem. Amps entered into an agreement with Service Electric to do the electrical work on the Woodlake project. Amps' agreement with Service was for Service to purchase the electrical supplies and do the installation. Amps' remuneration would be ten percent of the project (or $7,200) and Service would retain the remainder of the $72,375. Service apparently purchased material for other contracts it was performing at the same time. Amps had estimated the costs of electrical supplies for the Woodlake project as costing approximately $23,000. Service Electric charged electrical supplies to an electrical supplier, Goforth Electric Supply, of over $59,000, plus another $700 from City Plumbing Co. For reasons not shown on the record, Piedmont required Amps to resume its primary responsibility for the electrical work and remove Service from the project. Service had worked on the job from about February 1973 until April 1973, at which time Amps resumed the work and continued the project until the electrical portion was completed, and accepted by Piedmont and the owner. After Amps resumed work in its own capacity in April, Piedmont issued checks to Amps payable to Amps and Goforth Electric Supply as joint payees. Prior to that time, Piedmont had issued all draw checks to Amps alone. These earlier checks had been picked up by Service and negotiated by Service by virtue of a power of attorney. Amps denied owing any money to Goforth Electric Supply or City Plumbing Co. for any electrical supplies utilized on the Woodlake

project. Although Goforth and City Plumbing each filed liens against the Woodlake property, neither ever prosecuted their lien nor collected any money from Amps or from Piedmont. Thus, it reasonably appears that Service probably charged electrical supplies from Goforth for material for projects other than the Woodlake job. Up until Piedmont started issuing checks in the joint names of Amps and Goforth, Piedmont had paid Amps $49,470 toward the total contract price of $72,375, leaving a balance of $22,905. From April until the completion of Amps' work, Piedmont issued one check payable to Goforth and Amps in the amount of $11,205. Amps negotiated the check and deposited it into its account without obtaining the endorsement of Goforth. Upon protest of improper endorsement, Amps returned the $11,205 to the bank. Thereafter Piedmont issued two more checks, also picked up by Amps but payable to Amps and Goforth in the amount of $4,750. Piedmont also prepared another check payable to Amps and Goforth in the amount of $1,447 but this check was never picked up by Amps and remained in the possession of Piedmont. After the first $11,205 check was protested, the president of Amps went to Goforth and sought Goforth's cooperation in co-indorsing the checks. Goforth refused to cash any checks until satisfactory arrangements were made to settle Service's indebtedness to Goforth amounting to $59,000. As a result Amps was not able to endorse or obtain the proceeds of any of the jointly payable checks issued by Piedmont after Amps returned to the Woodlake job in April, leaving an unpaid balance of $22,905.

As to the Woods project, the evidence shows that Amps entered into the same general contractual agreement with Piedmont as on the Woodlake job. Contrary to the results obtained in the Woodlake project, both Piedmont and Amps were required to leave the Woods project prior to its satisfactory completion. Up until Amps and Piedmont were required to leave the site, Piedmont had paid Amps approximately $81,726. Amps offered testimony that it submitted draws once each month. Each of such draws had been paid when submitted except as to the last one. Shortly before termination by the owner, Amps submitted a draw to Piedmont for $8,114. Also pursuant to the contract, Piedmont had retained $2,717 which in the absence of dispute would be paid to Amps upon completion of the work. Amps had worked for approximately two weeks after the last unpaid draw (of $8,114) before termination. Amps therefore sought an additional $4,000 as an estimated figure for work performed during the last two weeks. Thus Amps sought $14,831 as an unpaid amount for the Woods project. However, Amps conceded that because it had not received its last draws, it was indebted to one of its suppliers in an amount exceeding $13,000. That supplier successfully

filed claim against Piedmont's performance bond insurer for $9,565 necessitating Piedmont to reimburse its insurer the $9,565. Amps paid the supplier the remaining $4,000. After unsuccessful demands for the $22,905 plus interest paid on the Woodlake job and $14,831 unpaid on the Woods job, Amps brought the present suit against Piedmont. Piedmont entered a general denial and sought a $9,565 counterclaim against Amps as reimbursement for the contribution Piedmont made to its insurer. After a two-day trial, the jury returned a verdict for Amps in the amount of $22,905 plus $9,620 interest. Apparently the jury found no verdict in favor of Amps on its $14,831 claim emanating from the Woods project nor in favor of Piedmont on its $9,565 counterclaim. Piedmont brings this appeal enumerating seven errors. *Held:*

1. In commencing our consideration of this case, we must first determine so far as possible, what was involved in the monetary verdict of the jury. While there were two separate contracts involving two different work sites, it appears obvious that the jury awarded Amps full recovery on its demand for the unpaid balance on the Woodlake project. Amps sought $22,905 plus interest, which was the exact amount awarded. In relation to the Woods project, Amps sought $8,114 as an unpaid draw (for work completed), $2,717 retained by Piedmont over the working life of the contract, and $4,000 as an estimated cost for the last period of work, a period that was estimated as one, two or three weeks as to length and equally indefinite as to expense. Ignoring because of vagueness the $4,000 figure, Amps' more concrete demand for approximately $10,000 was generally offset by the counterclaim by Piedmont for approximately $9,600. In any event, the verdict transparently omitted any monetary recovery either for Amps or Piedmont based on the Woods project. We feel justified in reaching this conclusion because a verdict and judgment must be construed in connection with the pleadings. *Bentley v. Still,* 198 Ga. 743 (32 SE2d 814). Moreover, the judgment of the court should conform to the reasonable intendment of the verdict upon which it is based. *Turley v. Turley,* 244 Ga. 808, 809 (262 SE2d 112). In substance therefore, those enumerations of error based upon the Woods project which Piedmont protests benefit Amps, at best are harmless. See *Maloy v. Dixon,* 127 Ga. App. 151, 156 (193 SE2d 19).

2. Piedmont raises most of its enumerations of error by protesting that the trial court erred in denying its motions for directed verdict during the trial and its motion for judgment nov. In its first enumeration Piedmont argues the trial court erred by failing to find that Amps breached the contract by failing to comply with all the contractual provisions. The contract provided that Amps would

pay all sales taxes on electrical materials purchased. Piedmont contends that Amps should have but did not prove that it had paid sales taxes. There is at least an implication that Amps did pay sales taxes for the president of Amps testified that figures were submitted to the state who in turn furnished such information to Piedmont. Piedmont did not protest to Amps concerning the nonpayment of sales taxes. Secondly, Piedmont argues that the contract required Amps to satisfy all materialmen thereby precluding liens. As to the Woodlake project, the only two liens filed were by Goforth Electric Supply and City Plumbing Company. It is not disputed that neither of these creditors of Service Electric ever pursued their liens against either Piedmont, the owner or Amps. For all the transcript shows, these debts were for electrical equipment purchased by Service for use in other projects. In any event, no party to this trial suffered any harm from the filing of the liens. Nevertheless, Piedmont argues the contract provisions were material provisions of the contract between Piedmont and Amps, the breach of which precludes Amps from pursuing any remedies under that same contract. See *Henderson v. Cochran,* 213 Ga. 642, 645-646 (100 SE2d 910); *Beach v. First Federal Savings &c. Assn.,* 140 Ga. App. 882, 884 (232 SE2d 158). The difficulty with this reasoning is that the cited cases establish the proposition that where there is a condition precedent to final payment of a contractual obligation, that condition must be fulfilled before a breach for non-payment may occur. In this case there is nothing in the contract that conditions Piedmont's obligation to pay for services rendered by Amps to payment of sales taxes or maintaining a lien-clear contract execution. To the contrary, the contract actually seems to recognize the possibility of such potential incumbrances. Piedmont, by the contract, was entitled to withhold upward of three percent of the value of the subcontract to offset potential default in sales tax payments by Amps. As to the potential of liens, Piedmont could call upon Amps to reimburse it (Piedmont) for any lien losses suffered by the owner or Piedmont. In fact, Piedmont did exercise that right in this suit. We find no conditions precedent in this contract and thus no merit in this ground for new trial.

3. In its next pertinent enumeration of error, Piedmont contends that it did not default on the Woodlake project inasmuch as Piedmont paid $49,470 which was acknowledged by Amps, and the remainder of the balance due on the contract was tendered to Amps in the form of draw checks which either Amps cashed, held and failed to cash, or was available to Amps but Amps did not pick up the check. The fallacy in this argument is that Amps denied that it owed any money to Goforth or City Plumbing on the Woodlake project but

Goforth refused to cooperate in endorsing any checks made payable jointly to Amps and Goforth. Even though Amps cashed one check for over $11,000, it was forced to return this check's proceeds to the bank because of improper endorsements. We have no hesitancy in concluding that Piedmont's payment to Amps for the balance owing on the Woodlake project by what, for all practical purposes were non-negotiable instruments, thus precluding Amps from realizing any benefit, amounted to no payment at all. We find no merit in this enumeration.

4. In its next enumeration, Piedmont complained that Amps did not prove its damages as to either contract with sufficient particularity to enable it to recover damages. Piedmont contends that Amps was required to prove its costs, profits, etc. in order to establish damages. See *Solon Automated Services v. Pines Assoc.,* 156 Ga. App. 34 (274 SE2d 12) and *Hospital Authority of Charlton County v. Bryant,* 157 Ga. App. 330 (277 SE2d 322). Piedmont misconceives the nature of the contract. Amps was entitled to a flat fee of $72,375. It received only $49,470. Its costs, profits or losses were immaterial to the entitlement to the final figure. The evidence clearly shows that Amps was due a balance of $22,905. As we held hereinabove, that figure was never tendered in satisfactory form. Thus there was no error by the trial court in concluding that Amps had sufficiently established its damages. This enumeration is nonmeritorious.

5. While we have held that we would not consider any enumerations dealing with the Woods contract, we will consider the merits of Piedmont's claim of error on the denial of its motion for directed verdict as to its counterclaim for $9,565. Our consideration of the evidence dealing with this enumeration ineluctably leads us to the conclusion that Amps established sufficiently to withstand a motion for directed verdict that Amps was owed approximately $10,000 or more on the Woods contract. It also is clear that Amps caused a loss of $9,565 to Piedmont by forcing Piedmont to contribute that amount to its insurer as reimbursement for the insurer's payment to one of Amps' creditors. Thus there was direct probative evidence establishing a right of action in each party to the controversy subject to jury ratification. The direction of a verdict is proper only where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. *State Farm Mut. Auto Ins. Co. v. Snyder,* 125 Ga. App. 352 (187 SE2d 878). Under the facts presented, logic compels us to conclude that the jury would have been authorized to find in favor of either or both parties, but as it was empowered to do, chose to cancel out one claim against the other

and in effect rendered a so-called "dogfall" verdict, awarding nothing to either party. We find no merit in Piedmont's claim of error pertaining to its counterclaim.

6. Most of Piedmont's remaining enumerations of error deal with the Woods contract and present at most harmless error. Its last enumeration of error, dealing with Amps' licensure, has been expressly abandoned. Finding no enumeration of substance, we affirm the actions of the trial court.

*Judgment affirmed. McMurray, P. J., and Banke, J., concur.*

DECIDED JUNE 14, 1982.

*Jay E. Loeb,* for appellant.
*Charles A. Pemberton,* for appellee.

